## Case No. 13,244a.

### SPOONER v. DANIELS.

[Betts' Scr. Bk. 505.]

Circuit Court, S. D. New York. Oct. 21, 1854.

LIBEL—JOURNAL PUBLICATIONS — PARTIES LIABLE — CRITICISM—MALICE—EVIDENCE.

[1. Liability for a libelous article published in a journal extends to the owner and editor, whether they had personal knowledge of the publication or not; but not to a mere hired contributor, unless he either wrote the article, or induced its insertion.]

[2. A critical article, in which the words "swindler," "humbug," and "fraud," are applied to the author of a work of art, is libelous in itself, and gives rise to a presumption of malice sufficient to support an action, without proof of damage.]

[3. When actual malice is proved in the publication of an article disparaging a work of art, the person responsible for it cannot shield himself from liability on the ground that he was acting in the capacity of a critic.]

[4. Evidence which would amount to justification may be introduced, though justification is not pleaded, but in that case it can only go to reduce damages, and not to defeat the action.]

[5. If the jury find from the tone and tenor of an article of criticism that the writer is actuated by general malice, a disposition to scandalize the plaintiff's works, though not arising from personal ill will, growing out of any personal acquaintance with plaintiff, they may award exemplary damages.]

[This was an action at law for libel, brought by Shearjashub Spooner against John W. Daniels. The article complained of purported to be a criticism upon a work of art produced by plaintiff, namely, a restoration or reproduction of Boydell's Illustrations of Shakespeare.]

BETTS, District Judge (charging jury). I suppose, gentlemen, you will feel that it was time that this controversy should be brought to a close, so that you may bestow upon it that action which now devolves upon you as sworn jurors in the case. The scheme of this action, gentlemen, is that the plaintiff, being the owner of this publication, had been traduced and defamed, by a publication made by the defendant in a newspaper in the state of Virginia; that he has been personally injured by that attack, as it was defamatory to his character, and that he had also been prejudiced in the work which he had published, and was attempting to circulate and dispose of. This imposes upon the plaintiff, in order to sustain his action, to show, firstly, that he was proprietor of this publication, and that he was the owner of this edition of Boydell; secondly, that the defendant is the person who has published the defamatory articles; and, thirdly, that his article is, of itself, or by extraneous circumstances, of such a slanderous character as to make it the subject of a lawsuit. It is not necessary to establish a degree of property in the points that would enable him to claim them, nor any other act of ownership than the possession and claim of the right to them. If the evidence shows you that he has conducted himself in respect to them as the owner, dealt with them as the owner, then he is to be regarded, for all the purposes of this trial, as the owner, there being no evidence controverting a natural inference from those facts. The next important step is to satisfy you, upon the evidence, that he has selected, and made the subject of this action, the individual whom he supposes has done the

wrong. He must prove to your satisfaction that the defendant is either the author of this publication, or in such position, in respect to it, that he becomes responsible for it. First, he must prove authorship by direct positive testimony to that fact, or he may establish it by the proof of such circumstances and facts as necessarily lead to the inference that he was the author; and, when he has given evidence enough to raise a fair presumption that he is the writer of it, then it devolves upon the defendant to exonerate himself from the effect of the inference in proof. The law makes the owner, proprietor, or editor of a paper or periodical answerable for all slanderous and injurious articles inserted in it, because it is in his power to prevent such insertion, and because, when the article appears, and inflicts the injury, the law presumes it is with his consent. It is a presumption of law, and not a presumption of fact. The proprietor may be as ignorant as any other man in the community of the article, until it appears in print; he may trust his foreman or general agent to select articles, and determine upon their insertion; he may not be personally cognizant at all of the particular publication,—still the law will presume, for general purposes, for the order, convenience, and good of society, him to be the individual who has consented to authorize the publication. You are then to look at the facts, gentlemen, in order to ascertain whether or not the testimony proves Mr. Daniels, the defendant, to be the writer of the articles. In that particular, you have one branch of evidence, one portion of the testimony, that seems to be direct and positive; but it consists in the declarations or admissions, directly or impliedly, upon the part of Mr. Daniels. I refer to the testimony of Mr. Peebles. Now, in regard to declarations or admissions, when offered against a person in evidence which may affect his property or person, or establish aught against him in favor of another, the law always admonishes the jury to exercise great caution. It is very difficult for a witness, after a lapse of any period of time, or, indeed, immediately afterwards, always to restate precisely in words what he heard another person say. Now, in this instance, as in others, the whole effect of the declaration rests in a statement of the precise language used. If Mr. Daniels, at the interview with Mr. Peebles, said: "That is my article," or referred to it as his article, assuming it to be his own, that would be an admission of the fact; and, in view of such testimony, the jury would be called upon, without some other explanation, to hold him responsible. But if Mr. Daniels said: "The article published in the newspaper," or "That article, is justifiable, and it is all right and proper," it would not be an acknowledgment that he was the author or writer of it. It does not assume him to be the composer of it, but it assumes him to be the defender of it, and one who is willing to stand answerable for the justice of the remarks. Now, in a matter of this kind, as in all others, you will proceed very cautiously. In this case, where a defendant may have removed all possible doubt upon the subject, it is for you to say whether there is ground for doubt—whether it is safe to trust the memory of the witness in the use of a particular pronoun or particle, so as to fix the result of the whole case upon that circumstance. We may suppose Mr. Peebles to be perfectly ingenuous in the matter, devoid of excitement or enmity towards Mr. Daniels, and entertaining no disposition to falsify or misrepresent what he really said, but to be an honest reporter of the precise language employed, yet, your own experience will have taught you how extremely difficult it is for a man to carry in his mind the precise expressions employed by another, even should the conversation be temperate; but if any animosity or excitement existed, if Mr. Peebles was seeking the adjustment of some difficulty, or urging a complaint, in such a case there would be more reason to distrust the justice of his memory.

If the plaintiff fails to prove that the defendant is the composer of the article, then the defendant is not censurable, unless he proves that he was in such a position in regard to this paper that he is legally responsible for the article published in it. It must be that he was the proprietor, that he had a pecuniary interest in it, or that he was placed in such superintendence and charge of it that enabled him to control the articles that were inserted. If he were the editor, then he is responsible, whether he wrote it or not; but if the evidence is shown to your satisfaction, and is not explained, that Mr. Daniels was only a contributor to the paper, paid for his services as employé of the paper, or writer, then he is not legally responsible for any insertion in that paper not emanating from himself. In regard to the facts of the case, let it be remarked that it is said upon the part of the plaintiffs that the defendant could easily prove whether he composed these articles or not, and he could also easily prove who did write them, because he had the power of examining his coeditors and proprietors of the paper. But this position, gentlemen, may be regarded in two views. The same witnesses who proved the fact upon the part of Mr. Daniels, and who were examined by him, were opened to examination, and were examined by the plaintiff. If they knew the fact, if it was incumbent upon the plaintiff to prove affirmatively, as the foundation of his action, who was the writer of the publication, it was his duty to examine those witnesses, and, instead of putting one single, general, loose interrogatory, he should have asked the witnesses: "Did you write the article?" "Do you know who wrote it?" "Did Mr. Daniels write it?" The witnesses were equally open to the plaintiff, but his side refused to put the question, and the inference

is just as strong that they dared not put it, as it is against Daniels that he dared not put it. In that respect they stand equal. Now, so far as respects the question of ownership or editorship, the testimony of the witnesses, if reliable, seems to dispose of that, and to establish the fact that Mr. Daniels was not connected with that paper in either of those capacities, but that he was only engaged as a salaried writer. If the evidence renders the defendant responsible, then it becomes necessary to look for a moment at the manner in which the plaintiff has put forth his grievance, because he cannot come into a court of justice and claim at your hands for damages, upon the ground that there had been various injurious and prejudicial remarks made regarding him individually, and his business avocations, or respecting the value of his property; but he must lay down on paper what has been said of him, and he must define, interpret, or mark out the meaning upon paper that is put upon those charges, and he must show to your satisfaction that he has put a true meaning upon them; that is to say, he must, in his declaration, as it is called,—his complaint of the wrong done him,—spread out what it is the defendant had written or said which is a slander against him, and, it being libelous matter, he must not only state the words, but also the meaning that gives them that libelous quality, and then, when he has done that, he must satisfy you by testimony that that is the proper interpretation at which they should be received. The plaintiff, you will perceive, gentlemen, from the tenor of the argument, as well as the course of the proof, conceives that he has been defamed by this writer personally, in his individual character, in a mode to affect the value of his property, and in relation to his profession or avocation as a compiler or designer of the work in question. The declaration sets out pretty much in words the substance of this newspaper publication, and you will observe, in reading it, that the publication does not purport to designate Mr. Spooner by name in those remarks that are injurious and offensive in their character; and one observation may well be made, in this respect, in regard to the tenor and spirit of this publication. It is what I believe the profession call a "slashing" article, and the writers of them suppose that they do high credit to themselves, and evince great smartness and talent, by using coarse, rough, and violent language; and if they apply that to individuals, if they give an application to it which tends to injure the party's character and reputation, they ought to be made to smart for their smartness. Every writer in the newspapers of the day should be held to a vigorous responsibility for the free use of his coarse and injurious epithets. There should be no immunity to him because he conducts a public paper. The arm of the law should reach him with more force to restrain him in that capacity. He being placed in a situation of doing wrong, of throwing distress into families, and attacking private character, should be called to a serious responsibility for the manner in which he discharges the power he holds in his possession. It is no sort of mitigation, in my judgment,—and I think I speak the voice of the law in that respect,—that a man is editor or contributor to a public paper, that he fills that paper with aspersions upon his neighbors' conduct and business. His being so would rather aggravate, than diminish, his offense. The inquiry here, you will observe, is, has he applied any remarks or charges of a slanderous character to Mr. Spooner personally? That is a matter that you must determine by inference. The innuendoes in the declaration, as they are called, say that the terms "swindler," "humbug," "fraud," are all designed to designate and mark out Mr. Spooner, the individual who owned the articles which are the subject of the newspaper remarks. If they do, and you find that the publication contemplated that, then the plaintiff has a right to say that he was the object in view of the writer, that he was the one intended to be slandered, and then that portion of the publication would be slanderous in itself. It is then libelous, and the foundation for an action, without showing any damage or malice on the part of the defendant, further than that malice which is always to be inferred from a publication which is false.

It is claimed that the defendant here published this article for the purpose of enlightening the public taste with respect to a work of art, and that, as a sort of monitor to public opinion, it was his duty to speak fairly and unreservedly of this work. Be it so. I shall make a remark upon that topic in a moment or two. Still the law gives him no liberty, beyond a fair criticism, to attack the character of the individual owner of that article. He had no right to assail the reputation of Mr. Spooner, or any person connected with him. He has no immunity to do that. He must restrict himself strictly to the line of a critic. He may point out the faults of this work. He is allowed to show that it is not deserving of the encomiums attempted to be put upon it, that it is worthless, without being subject to an action for slander; but when he goes beyond that line, and hurls stigmas upon the character of Spooner, if he calls him cheat, or any other imputation that is disgraceful to him, then he is undoubtedly answerable in damages for that wrong. But, gentlemen, it is your province to determine upon the questions of fact. It is not my habit to descant or comment upon the evidence. I leave that to you. I only mean to point out the principles of law which govern you in the application of the facts, after you have discovered what they are. Then, again, the defendant may protect himself in the publication upon the ground that he wrote merely as a critic (supposing that he had not slandered Spooner personally), and that he was endeavoring to point out the imperfections, as he deemed them, of the

work. He certainly can do this, unless the plaintiff succeeds in proving positive malice. But if the plaintiff can show that the publication of this article was made with express malice, and with an express design to injure the publication of the work of the plaintiffs, then the circumstances of the defendant in acting in the capacity of a critic would not shield him from liability to an action. Again, if it is proved that his publication was malicious, that his purpose was hostile to Spooner, and that he not only meant to write down his work, but to disparage it in such a way as to be offensive to the feelings of Mr. Spooner, still, if he (the defendant) had been able to show that the work, in itself, was of no value, or of very trivial value, then the plaintiff, although express malice is proved, is not entitled to a verdict compensating him for the loss he has sustained, but only to such a loss as necessarily results from the publication; and for the loss that you may judge he has sustained by this publication, you will remunerate him, if there is express malice proved against the defendant in the publication of these things. It is necessary, then, to entitle the plaintiff to damages, not only for him to prove that the publication was not a fair and proper criticism, and that it was conducted by malice, but he must also prove that he has sustained injury in consequence. Now, supposing that it was not a criticism, in the fair sense of it, but a malicious publication, what is the evidence to establish damages, as claimed by the plaintiff in that respect? In the first place, it is not necessary for him to prove positively the degree and extent of the damages, but he must prove the facts from which you are led to judge that the publication must have done him an injury. Now the only evidence on that point is in respect to the extent of the sale made in the South. If, upon an examination of the evidence upon that head, that it is to be accounted for otherwise, and attributed with equal reason to other causes than the publication of the defendant, then you cannot make the defendant exclusively responsible for it. If you can suppose that the sale of this work was stopped, either because there was no public taste for it, or that it did not come up to the public expectation, or that it was too expensive, or from any other cause that frequently attends enterprises of this description, then the defendant would not be answerable for the publication of any angry article bearing upon the subject, because the plaintiff had not succeeded in finding a profitable market for his commodity; but if you find that this article controlled the public taste, or affected the disposition of the public to purchase, then you will say that he must make good to the plaintiff the loss he has occasioned him by a publication which he does not show is true, in itself. A point of law has been ruled by the court that, although the defendant, in an action for slander, who only pleads the general issue, and does not say he will prove the truth, cannot

not discharge himself from the action by proving that what he wrote was true, but he may diminish the damages if he satisfies the jury that the publication after all was substantially correct. Although they cannot acquit him, yet they will restrain the damages to what his real loss was in consequence of the publication. That will tend to diminish the damages. There is some controversy in the books upon that subject, and it may, perhaps, as yet, be an unsettled point in adjudicating upon a question of evidence in actions of slander and libel. Courts of high standing and character have admitted that evidence, while others have excluded it. However, I believe it proper in this case to say to you that the rule of law is, that when a man is sued for libel, although he does not plead justification, he may give evidence which would have amounted to justification, and that evidence would go to reduce the damages, but not defeat the action.

Now, gentlemen, a great deal has been said, in the course of the argument before you, upon the offensive and unfounded criticism that has been indulged in, and that leads you to the inquiry as to what are the rights of the plaintiff in regard to this property of his? what is the character that he has assumed to give to that property? and what is the attack which has been made on the part of the defendant? It is to be observed that his right to the property is not assailed or denied. But what does he claim to be his property? Certainly not, according to the evidence or tenor of his argument that he is the owner of the paper,—of the stamp upon the paper,—that that is his personal chattel, in respect of which he maintains an action for; but he claims to be the person who, by his skill and enterprise and money, has brought back into re-existence an old lost work of art, of high value and worth. He does not say, in his declaration, that he has composed a work equal to or superior to Boydell's Shakspeare, but he takes the ground that he has restored what was lost to the public by the wearing out of the old copperplates upon which Boydell's edition of these illustrations was stricken off and printed. Now, then, he assumes in his capacity but a limited right. He takes but a limited and restricted right of possession over his property. You must, then, look at the evidence, and see whether he proves that he has restored Boydell's edition to what it was originally, and whether this American edition is the English edition republished or reprinted, precisely as if he had taken the original plates, while they were still alive, to give off their proof impressions, and had struck them off here, and made the American edition the same as those in England. In regard to this matter, some witnesses have said that they do not think these prints are equal to Boydell's, and, others, again, do not think that Boydell's work was one of high art and merit. But that is a subject for your consideration, in one point of view. If you find that these are facsimiles of the original prints, then it may become a

material question in this case whether that was a work of high art and merit. There can be no doubt but that artists will differ widely in their valuation of mere works of art and taste. One class of gentlemen will value the high perfection of the mechanical art of engraving; another, that the printing was of a high order; and a third, belonging probably to the greater mass, will value them because they really translate and exhibit the thoughts of the great dramatist whose works they are intended to illustrate. You therefore see, gentlemen, the wide field that you must enter upon when you undertake to determine from the evidence whether these prove to be a work of that character. I suppose it is very familiar to you all that men of deep study, men of the most extraordinary genius, will radically differ as to what is the true representation of the spirit of Shakspeare. If you have not experienced that difficulty by the study of picture and prints, you may have attended theaters, where men of great talent have appeared upon the stage to illustrate Shakspeare. You may remember, perhaps, the exhibitions of Cooks, young Kean, and Macready, as well as our own artists, and thus undertake to apply them to some of these illustrations. Lear, Othello, or Hamlet, and be enabled to call to mind whether you have ever seen any two of these artists who would give the same representation of the spirit of the author, in the construction of the character they attempted to represent. So it may be with regard to publication. One class of judges, taking up these prints, might say: "They are the embodiment of my idea of Shakspeare," and another class of very experienced men, of high taste, might say: "We consider them worthless in that point of view, for they do not reproduce my apprehensions of the dramatist's idea of the individual or the scene, and are only valuable as works of art." Another would say: "I will buy that picture; for, if those are the faces of the men when they existed, it will be valuable to me." Each one, you will see, therefore, puts a value upon it according to his own mind. The object of these remarks is to show you, when you go into the field of determining the value, how broad and indefinite it is; for should any number of amateurs or connoisseurs be examined before you with respect to supposed illustrations, you would be just as much blinded as now in regard to the appreciation placed upon them as works of illustration; but, when you came to the question whether the works are of high art and finish, you can get more satisfaction, and you can determine two things—first, whether they are counterparts, facsimiles, and reproductions of the original Boydell; and, if they are, whether they are works of high art and value. If the plaintiff proves that they are works of high art and value, then he is not to be injured in his possession of that property, and is entitled to compensation at your hands for the loss sustained.

The defendant's counsel has laid before the court a list of instructions, which he wished me to submit to you. So far as I adopt his idea, they have been included in the statement I have made to you, and, where they have not, the responsibility will rest upon me, and he can take his exceptions. You will, then, gentlemen, take the following as the rules of law to govern you in this inquiry: Ascertain whether Mr. Spooner was the owner of the publication, ascertain whether Mr. Daniels wrote the article which is alleged to be defamatory, ascertain, if he did not write it, whether he is the proprietor of the paper; then, with this article before you, and with evidence to establish each of these facts, he is responsible for it, in the judgment of the law. But, if he was merely a hired contributor, he is not answerable, unless there is evidence to show that he induced its insertion, and thus contributed to the promulgation of his slander. Then you are to inquire as to the meaning of this article. If it imports anything derogatory or prejudicial to the personal character of Mr. Spooner, he is entitled to damages for that libel, so far as you may judge to be a proper compensation. If you find that when the owner offered this publication for public sale as a reprint and facsimile of the original Boydell, and it was so, that the publication of this article was prejudicial to the sale, and you will find that the publication was made maliciously to that end, you are to give damages to the plaintiff for the loss he has sustained in that point of view; and, also, if you find, on the other hand, that the defendant has shown that these articles are not the original Boydell's, if you find that he has shown that they are not highly valuable as works of art, if you find that they are not illustrations of Shakspeare, these facts will go in diminution of damages. They will not take away entire damages, but go in mitigation, or to lessen the damage. And if you find that the defendant was actuated by general malice in this matter, a disposition to scandalize the plaintiff's works, and if you find that not from any previous acquaintance he had with the plaintiff, or from any ill will he had borne to the plaintiff before, if you derive that judgment from the tone and tenor of his publication, then you are entitled to lay heavy damages upon him beyond the actual injury that the property sustained. But if he has written in a spirit denoting a purpose to injure the character, hurt the feelings, prejudice the property, and break up the pursuit of the defendant, then he ought to be made responsible for that malicious purpose, although that malicious purpose may result from this high-handed and boisterous manner in which he speaks against the Northern people, and against Mr. Spooner, as an individual from the North; but, gentlemen, you must take care not to endeavor to vindicate the people of the North from the senseless aspersions thrown upon them, by punishing him in damages, and bestowing those damages upon Mr. Spooner. You will award Mr. Spoon-

er damages in accordance with the injury that he has received. I now leave the case in your hands.

The jury then retired for consultation. When they returned into court, they rendered a verdict for the plaintiff. Damages, $3,250.